# 2008 DTA 81

### TRIBUNAL DE APELACIONES
### REGIÓN JUDICIAL DE AIBONITO, PANEL XI

JUANITA SANDOVAL MARTÍNEZ; SU ESPOSO OSVALDO COLON TORRES;
Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Apelantes

v.

UNIVERSIDAD DE PUERTO RICO; LUIS A. TOLEDO; MIGNA NEGRÓN; GLORIA PICÓ;
FULANO DE TAL; MENGANO DE CUAL; COMPAÑÍAS DE SEGUROS A Y B
Apelados

Núm. KLAN-06-00733

San Juan, Puerto Rico, a 6 de junio de 2008

Panel integrado por su Presidenta, la Juez Pesante Martínez,
la Juez Feliciano Acevedo y el Juez Escribano Medina

Pesante Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Mediante Sentencia de 6 de febrero de 2008, notificada el 29 de febrero de 2008, el Tribunal Supremo remitió el caso de epígrafe para que lo atendiéramos en sus méritos. Luego de examinar la prueba documental incluida en el expediente y los argumentos de las partes involucradas, así lo hacemos.

Adelantamos que revocamos el dictamen apelado, esto es, una Sentencia Sumaria de 3 de mayo de 2006,

notificada el 10 de mayo de 2006, que dictó el Hon. Juan Ortiz Rodríguez, Juez del Tribunal de Primera Instancia (TPI), Sala Superior de Aibonito. Mediante el referido dictamen, el TPI acogió la moción de sentencia sumaria que presentaron los apelados, Universidad de Puerto Rico y ciertos funcionarios suyos (UPR). De esta manera, desestimó sumariamente la acción que presentó la apelante, Juanita Sandoval, Osvaldo Colón Torres y la sociedad legal de bienes gananciales compuesta por ambos (apelante).

Inconforme con el dictamen, y en resumen, la apelante planteó que erró el TPI al haber dictado sentencia sumaria, ya que la prueba que ofreció alegadamente demuestra que existe controversia sustancial de hechos materiales. En reacción a lo anterior, la UPR planteó que la relación de hechos que sirvió de base a la sentencia apelada se circunscribió a la versión que ofreció la propia apelante. Adujo que no venía al caso que la apelante hiciera alusión a prueba que controvirtiera los hechos que apuntó. Indicó que, en este caso, la modalidad de sentencia sumaria que se invocó fue la de insuficiencia de prueba. La UPR planteó que la prueba con la que contaba la apelante no ameritaba la concesión de remedio. Así lo planteó la UPR ante el TPI mediante solicitud de sentencia sumaria, y esté foro adoptó su teoría.

Entendemos que la determinación del TPI fue errada. Por ello, como ya indicamos, revocamos el dictamen apelado.

## I

Esbozamos una breve relación de los hechos más relevantes a la resolución del asunto planteado. Nos servimos para ello de las determinaciones de hechos que esgrimió el TPI en el dictamen apelado.

Se determinó como un hecho que la apelante trabajaba como economista para el Servicio de Extensión Agrícola (SEA). El SEA es una dependencia adscrita al Recinto Universitario de Mayagüez de la Universidad de Puerto Rico. Su trabajo consistía en adiestrar y capacitar a la población rural y desventajada económicamente del pueblo de Orocovis. Ofrecía servicios a agricultores, amas de casa, jóvenes y líderes comunitarios.

El SEA respondía, en última instancia, al Decano del Colegio de Ciencias Agrícolas del Recinto de Mayagüez de la UPR. Para el tiempo en que comenzaron los hechos objeto del litigio, laboraban junto con la apelante, el agrónomo Doel Pérez, la secretaria María M. Ortiz Meléndez (secretaria del SEA) y una empleada de mantenimiento. En el 1997, la secretaria del SEA, casada, comenzó una relación extramarital con uno de los clientes -el agricultor, Luis Santiago (Sr. Santiago). Este último estaba casado con Migdalia Ortiz (Sra. Ortiz).

En resumen, la Sra. Ortiz se enteró de que su esposo, el Sr. Santiago, sostenía la relación extramatrimonial con la secretaria del SEA. Entonces, **comenzó a hacer llamadas amenazantes al SEA. En varias ocasiones, a la apelante le tocó atender las llamadas. La Sra. Ortiz advirtió que se personaría a las oficinas del SEA y que le *"entraría a tiros"* a la secretaria del SEA y a cualquiera que se interpusiera. Sugirió en múltiples ocasiones que el personal del SEA, avalaba la conducta de la secretaria. Por ello, les tildaba de inmorales.**

La apelante comentó sobre el asunto al agrónomo Doel Pérez. Posteriormente, el personal se reunió para discutir la situación. La secretaria del SEA les confesó que sostenía una relación amorosa con el Sr. Santiago. Les sugirió que no interfirieran con su vida privada. Doel Pérez se limitó a comentarle que esperaba que su vida privada no afectara su trabajo.

**Se trajo a colación que, en efecto, el desempeño de la secretaria del SEA mermó y que los servicios se afectaron.** Se comentó sobre las quejas de los clientes, e incluso, de que se suspendieron clases o seminarios que se impartían en las oficinas del SEA. En particular, un líder comunitario que impartía cursos en las oficinas del SEA sentía temor de que ocurriera un incidente violento con la Sra. Ortiz. **Según se determinó, los servicios se afectaron a tal grado que Doel Pérez y la apelante tuvieron que comenzar a salir de las oficinas para prestar los servicios eficientemente en el campo.**

La Sra. Ortiz continuó haciendo las llamadas. Advertía sobre el paradero de la secretaria del SEA en horas que se suponía estuviera en la oficina. También, reiteró su amenaza de llegar a las oficinas del SEA a matar a la secretaria. De hecho, en una ocasión, cumplió con llegar al SEA. El incidente, aunque no tuvo desenlace fatal, sí fue objetó de **querella ante la policía**. La apelante tuvo conocimiento, al menos de otro incidente en el que también medió intervención policíaca.

Cerca de agosto de 1998, las llamadas de la Sra. Ortiz cesaron. Para esa fecha, la secretaria del SEA contemplaba abandonar su trabajo. No obstante, a instancia de la Unión de empleados a la que pertenecía, optó por tomar una licencia sin sueldo, la cual disfrutó hasta mayo de 1999. Ahora bien, apenas unos días antes de que se reincorporaría al trabajo, la Sra. Ortiz llegó nuevamente al SEA. Se dirigió a la apelante y le comentó que sabía que la secretaría había tomado una licencia y que regresaría a trabajar. **Esta vez, personalmente, reiteró su amenaza de que pretendía matar a la secretaria del SEA y a cualquiera que intentara detenerla.** La Sra. Ortiz, además, le indicó a la apelante que consideraba a todos los que trabajaban para el SEA como unos inmorales por no haber tomado acción contra la secretaria.

**La apelante informó sobre lo sucedido a varios dé sus superiores, entre ellos, al Decano del Colegio de Ciencias Agrícolas. No recibió respuesta a su reclamo.** En junio de 1999, reincorporada la secretaria del SEA, la apelante dejó de trabajar para el SEA. Así lo hizo por **recomendación médica** que presentó a sus superiores. A esos efectos, surge del expediente una carta dirigida al subdirector del SEA.

En el referido escrito, la neurofisióloga Norma Agosto Maury advirtió que la apelante padecía de epilepsia y diabetes; que la condición de la apelante no lograba estabilizarse a pesar de estar bajo tratamiento con los medicamentos indicados; en fin, **recomendó que se le reubicara de área de empleo. Adujo que el área en el que se encontraba la apelada constituía un ambiente ansiogénico y dañino, y así lo entendía tras analizar el deterioro que experimentó la apelada durante ese año (1999). Posteriormente, la apelante solicitó que se le reubicara a la oficina del SEA en Barranquitas.**

En respuesta a la recomendación médica aludida, se citó a una reunión a la apelante. **El Director Regional del SEA (Luis Toledo) le indicó que no podía concederle el traslado o reubicación.** Indicó que la apelante era la única que desempeñaba las funciones de economista en Orocovis, y además, que allí era que se requería de sus servicios. **Aún cuando se comprometió a tomar acción respecto a la secretaria del SEA de Orocovis, se determinó como un hecho que nada se hizo al respecto.** También se determinó que una semana después de esta reunión, se le informó a la apelante que la Unión de trabajadores que representaba a la secretaria del SEA había advertido al Director Regional del SEA que *"no podía tocar"* a la secretaria, esto es, que no podía trasladarla de Orocovis.

Ante la negativa de sus superiores de concederle el traslado al SEA de Barranquitas, la apelante solicitó entonces una reunión a la supervisora de los economistas del SEA – Migna Negrón. **Se convocó una nueva reunión, y en ella, se le indicó de la determinación definitiva de no tomar acción respecto a la secretaria del SEA.** Se le informó a la apelante que tenía que seguir trabajando en Orocovis. Frente a la determinación institucional en cuestión, **la apelante sufrió una crisis nerviosa**; comenzó a golpearse contra la pared, rasgarse la ropa y a arañarse la cara. Como resultado del episodio, **se recluyó a la apelante en el Hospital Siquiátrico San Juan Capestrano.**

Cuando salió del hospital, se le concedió a la apelante una licencia por enfermedad que se extendió hasta octubre de 1999. Cuando acabó la licencia, la apelante se reincorporó a sus labores para prestar servicios al área de Orocovis, peró se reportó a trabajar a las oficinas del SEA en Barranquitas. Para ello, no contó con la previa autorización de sus supervisores. Posteriormente, en diciembre de 1999, se le autorizó a rendir sus servicios a Orocovis aun cuando se presentara a trabajar en las oficinas de Barranquitas. Sin embargo, se le indicó que 4 días debía trabajar en el campo y sólo un día en la oficina.

Aunque no se determinó como un hecho, la apelante alegó que en la Oficina de Barranquitas permeó un ambiente hostil de trabajo. No tenía acceso a materiales y el área que tenía disponible para trabajar, alegadamente, estaba en grave estado de deterioro. Alegadamente se le insistía en que debía regresar a trabajar a las oficinas de Orocovis. Según el historial que aparece en un informe de un perito siquiatra adjunto al expediente de este caso, ante las condiciones de trabajo que enfrentó la apelante en Barranquitas, sufrió otra crisis. Tuvo que recibir tratamiento en febrero de 2000. Según el referido informe, la apelante recayó nuevamente en junio de 2000.

Por otra parte, ya en mayo de 2000, la apelante había presentado la causa de acción contra la UPR. En resumen, reclamó que la inacción de la UPR en atender la situación de amenazas y ambiente hostil laboral que propició la relación amorosa de la secretaria del SEA con uno de los clientes, causó que la apelante desarrollara unas condiciones, sufrimientos y angustias mentales que incluso le incapacitaron para continuar trabajando.

Sí se estableció como un hecho que en septiembre de 2000, se le ofreció una posición a la apelante como parte de un programa que operaría en Orocovis. La apelante rechazó el ofrecimiento. Alegó la apelante que la posición que le ofrecieron era una transitoria y que la extensión del nombramiento dependía de la cantidad de los fondos federales que se asignarían para crear y operar el programa.

Posteriormente, en marzo de 2001, se convocó a otra reunión a la que se citó a la apelante. Por un incidente que se suscitó en la reunión, que involucró a uno de los presentes y la apelante, esta última **volvió a sufrir una crisis nerviosa. Según determinó el TPI, aquélla no pudo recuperarse de la referida crisis, por lo cual se encuentra incapacitada.**

Basándose en estos hechos, en la prueba documental, en la solicitud de sentencia sumaria y el escrito en oposición, más asumiendo que en su día la apelante pudiera haber demostrado el nexo causal entre los daños que alegó, **el TPI concluyó que no era factible para la UPR prever que la apelante se incapacitaría mentalmente por razón de unas amenazas que no estaban dirigidas a ella, sino a la secretaria.** El TPI indicó que aun cuando las amenazas involucraran a *"cualquier otra persona que tratara de impedir los designios delictivos de la Sra. Ortiz",* la apelante no era la destinataria de dichas amenazas, sino que meramente era un **sujeto pasivo** que únicamente se podía ver afectada en caso de haber intercedido para evitar la desgracia de nunca sucedió (Conclusión de Derecho Núm. 9).

Añadió el TPI que no dudaba que la expectativa de que el centro de trabajo donde uno labora sea el escenario de un suceso desafortunado, como lo sería el asesinato de una compañera de trabajo, podría generar *"algún grado de aprehensión"*, pero no al punto de ocasionar total incapacidad. Reiteró el TPI que no era previsible para el patrono -UPR- anticipar que un empleado ajeno al triángulo amoroso se incapacitase para trabajar como producto de esa supuesta aprehensión.

El TPI avaló el argumento de la UPR a los efectos de que no tenía la obligación de trasladar o destituir a la secretaria, como sugirió la apelante. De hecho asintió en que de así haberlo hecho, **pudo haber violado el derecho a la intimidad y el derecho propietario de la secretaria respecto a su empleo.** Cuestionó el que la apelante nunca acudiera a la policía para denunciar la situación. Sostuvo que no le eximía a la apelante el que hubiera aducido que esperaba que así lo hicieran sus supervisores. (Conclusiones de Derecho 11 y 12). El TPI cuestionó el que la apelante insistiera en que fueran los supervisores los que promovieran la intervención de la policía si era la apelante quien único podía testificar sobre los actos delictivos de la Sra. Ortiz.

El TPI también indicó que las llamadas amenazantes se dieron entre marzo y abril de 1997 hasta octubre de 1998, fecha en que la apelante disfrutó de una licencia sin sueldo, y que se reincorporó a trabajar el 1 de junio de 1999. **[1]** Durante ese tiempo, no hubo llamadas amenazantes. El TPI determinó que las reclamaciones por las llamadas entre marzo y abril de 1997 a octubre de 1998 prescribieron.

Destacó entonces que un segundo período de llamadas comenzó en mayo de 1999, fecha para la cual ya la apelante conocía del daño que el **alegado ambiente de trabajo hostil le ocasionaba**; sin embargo, no fue sino hasta el 5 de junio de 2000 que presentó la demanda. **[2]** Concluyó el TPI que la demanda estaba prescrita. (Conclusión de Derecho Núm. 28).

Tomando en cuenta estos hechos, discutimos el derecho aplicable.

## II

La Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36, dispone que un tribunal puede dictar sentencia sumariamente cuando no hay controversia real sustancial en cuanto a ningún hecho material y procede como cuestión de derecho. Se ha expresado que sólo debe dictarse sentencia sumariamente cuando el tribunal sentenciador tiene ante sí **la verdad sobre todos los hechos esenciales**, de manera incontrovertible. *E.L.A. v. Cole Vázquez*, res. el 13 de abril de 2005, **2005 JTS 55**; *Vera Morales, et als. v. Bravo Colón, et als.*, res. el 27 de febrero de 2004, **2004 JTS 40**.

Por ser la sentencia sumaria un remedio de carácter discrecional, *"[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley"*. *E.L.A. v. Cole Vázquez, supra*. Es decir, la guía para saber si existen dudas sobre la procedencia de la sentencia sumaria, será la sana discreción judicial; en cuyo caso, el Tribunal debe brindar a las partes la oportunidad de una vista evidenciaria. *S.L.G. v. S.L.G.*, 150 D.P.R. 171, 193 (2000); *Rivera v. Depto. de Hacienda*, 149 D.P.R. 141, 155 (1999). Cualquier duda sobre la existencia de una controversia sobre los hechos materiales, debe resolverse contra la parte promovente. *Audiovisual Lang. v. Sist. Est. Natal Hns.*, 144 D.P.R. 563, 575 (1997).

Al dictar sentencia sumaria, el tribunal: (1) analizará los documentos que acompañan la moción en solicitud de sentencia sumaria y los documentos incluidos con la moción en oposición y aquellos que obran en el expediente del Tribunal; y (2) determinará si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *PFZ Properties, Inc. v. General Accident Insurance Co.*, 136 D.P.R. 881 (1994). En cuanto a la prueba, se ha establecido que la sentencia sumaria *"sólo debe concederse <u>cuando el promovente ha establecido su derecho con claridad</u> y ha demostrado que la otra parte no tiene derecho a recobrar bajo cualquier circunstancia que resulte discernible de las alegaciones y los documentos que obren en el expediente"* Benítez Esquilín v. Johnson & Johnson, 158 D. P.R. 170 (2002).

Por otro lado, en *Medina v. M.S.& D. Química P.R., Inc.*, 135 D.P.R. 716 (1994), se expusieron las normas relacionadas a la solicitud de sentencia sumaria bajo la modalidad de insuficiencia de prueba. Sobre este particular se indicó que después de que las partes hayan realizado un adecuado y apropiado descubrimiento de prueba, el promovente puede presentar su moción de sentencia sumaria alegando insuficiencia de prueba por parte del promovido. *Id.*, pág. 732. La moción puede acompañarla con todos los documentos relacionados con el descubrimiento de prueba o sin documento alguno, si éstos obran en el expediente del tribunal. **La parte promovente tiene el peso de demostrarle al tribunal que la parte promovida no cuenta con evidencia admisible suficiente para probar, por lo menos, un elemento esencial indispensable para su caso.** *Id*. Esto es, para que se pueda dictar una sentencia sumaria por insuficiencia de la prueba, el promovente tiene que persuadir al tribunal de que **no es necesario celebrar una vista evidenciaria**; que el promovido no cuenta con prueba suficiente para probar un hecho esencial de su causa de acción, y que, como cuestión de derecho, procede que se desestime la reclamación. *Id.*, páginas 733-734.

El promovente puede acompañar su moción con evidencia afirmativa, no necesariamente obtenida mediante la utilización de los mecanismos de descubrimiento de prueba. La prueba debe negar algún elemento esencial de la reclamación de la parte promovida. *Id.*, pág. 732. Por su parte, en caso de que se presente la moción con

evidencia afirmativa, el promovido podrá derrotar la solicitud con sólo presentar una oposición acompañada con una prueba que controvierta o que rebata la evidencia afirmativa presentada por el promovente. *Id.*, páginas 732-733.

La prueba en oposición que se presente puede o no ser admisible como evidencia. En caso de que no lo sea, en la forma en que se presentó, debe ser tal que podría convertirse en una prueba admisible o que podría dar lugar a una prueba admisible. *Id.* En resumen, para derrotar una moción de sentencia sumaria bajo la modalidad de la insuficiencia de la prueba, la parte promovida puede, entre otras cosas: presentar con su oposición una prueba admisible en evidencia o una prueba que pueda convertirse en admisible -aunque de momento no lo sea-, o que dé lugar a una prueba admisible que demuestre que existe evidencia para probar los elementos esenciales de su caso; que hay prueba en el récord que puede convertirse en una prueba admisible y que derrotaría la contención de insuficiencia del promovente; que la moción es prematura porque el descubrimiento de prueba es inadecuado, está a medias o no se ha realizado, o que éste, por su naturaleza, no es un caso que conviene que se resuelva por el mecanismo expedito de la sentencia sumaria. *Id.*, pág. 734.

Por último, conviene destacar que **a la modalidad de la sentencia sumaria por insuficiencia de la prueba le aplican todas las normas y los principios que deben utilizarse por los tribunales al entender en una moción de sentencia sumaria.** *Id.* Por lo tanto, cuando existe duda sobre si hay o no prueba suficiente o si hay una controversia de hecho, esta duda debe resolverse a favor de la parte promovida. Como ya se indicó antes, sólo debe concederse la moción de sentencia sumaria para desestimar una reclamación cuando el promovente ha establecido su derecho con claridad y ha quedado demostrado que la otra parte no tiene derecho a recobrar en cualquier circunstancia que resulte discernible de la prueba, pues hay que recordar que el tribunal resolverá lo que proceda en derecho y no necesariamente lo que se le solicita. En cuanto a los documentos que se presenten, éstos deben verse de la forma más favorable para la parte promovida, concediéndole a ésta el beneficio de toda inferencia razonable que se pueda derivar de ellos. *Id.*, páginas 734-735.

Basándonos en estos principios, llegamos a las siguientes conclusiones.

### III

Estimamos que, en este caso, erró el TPI al haber acogido la solicitud de sentencia sumaria que presentó la UPR. Independientemente de que la solicitud fuera o no bajo la modalidad de insuficiencia de la prueba, llegamos a la misma conclusión. De una u otra forma, aplican los mismos principios básicos que atañen a las solicitudes de sentencia sumaria. Siguiendo estos principios, entendemos que no se demostró con claridad la insuficiencia de prueba por parte de la apelante para probar los elementos de su causa de acción; tampoco, que aquélla estuviera desprovista de derecho alguno a recobrar **bajo cualquier circunstancia** que resultara discernible de la prueba.

Luego de examinar el expediente del caso, no estamos convencidos de que la prueba que al momento había sido objeto de descubrimiento de prueba, era a tal grado insuficiente que ameritara la resolución del pleito sin que se celebrara un proceso plenario. Estamos convencidos de que no se demostró satisfactoriamente que la apelante no contara con pieza evidenciaria alguna que probara **al menos un elemento esencial** de su caso.

Sin el ánimo de prejuzgar la controversia, concluimos que la prueba con la que contaba la apelante era suficiente, al menos, para derrotar la solicitud de sentencia sumaria. Primero, en cuanto a los elementos de su causa de acción, destacamos lo siguiente. Ésta alegó que la relación extramarital que sostenía una compañera de trabajo, también empleada de la UPR, con un cliente de la oficina en la que laboraban, incidió en el funcionamiento de dicho centro de trabajo. La situación escaló a tal grado que se convirtió en una amenaza a la seguridad de la apelante y los demás empleados. La esposa del cliente se enteró de la relación extramarital y llamó en múltiples ocasiones al SEA amenazando de muerte a la secretaria, y aludiendo a los demás empleados, aseguraba que cualquiera que se interpusiera correría igual suerte.

La apelante se movió por los canales a los que tuvo acceso para denunciar la situación a su patrono - la UPR. Independientemente de los acercamientos que hizo a sus superiores, no tuvo éxito. Solicitó, en resumen, que se trasladara del centro de trabajo a la secretaria o a ella. No se hizo lo uno o lo otro. De hecho, así lo determinó como un hecho el TPI.

Entendemos que la reclamación de la apelante nunca se dirigió a que la UPR interviniera, condenara o sancionara la conducta adulterina de la secretaria del SEA. Más bien, procuró que se tomaran medidas afirmativas respecto a los efectos que tal conducta "*de la vida privada*" de la secretaria estaba creando directa o indirectamente en el centro de trabajo. Las amenazas a la integridad física de la secretaria y los demás empleados continuaron por un período de tiempo considerable sin que se tomaran medidas precautorias. Lo anterior, según alegó la apelante, provocó que desarrollara una condición mental. De hecho, el propio TPI determinó que, en efecto, la condición que desarrolló la apelante le incapacitó para continuar con sus labores.

En el expediente se anejó prueba acreditativa de que la apelante tuvo que ser sometida a tratamiento siquiátrico. De acuerdo a la prueba que obra en el expediente, los facultativos que intervinieron con aquélla adujeron que la génesis y el desarrollo de las condiciones de la apelante estaban ligadas al ambiente y condiciones de su centro de trabajo. La UPR tuvo conocimiento de la situación de la apelante, y además, de las recomendaciones e informes de sus médicos.

No obstante, notamos que en la sentencia apelada no se sopesó esta prueba. El TPI aceptó que, en efecto, las circunstancias que se propiciaron en el centro de trabajo en controversia pudieron afectar a la apelante. Sin embargo, concluyó que tal situación **no era previsible** para efectos del patrono -UPR. No estamos de acuerdo conque así se hubiera concluido sin un examen de prueba pericial.

En este caso, debe celebrarse juicio en el que se dilucide si existía o no algún deber de la UPR para velar por la seguridad de sus empleados en el centro de trabajo. Es cierto que fue una situación personal de un empleado la que inició la cadena de eventos que culminó con la reclamación de la apelante, pero la misma tuvo efectos en el funcionamiento del centro de trabajo en el que laboraba la secretaria del SEA y la apelante. La situación, según se infiere razonablemente del expediente, escaló a tal punto que se produjeron amenazas contra la vida e integridad física, no sólo de la secretaria del SEA (a quien en principio sólo debió afectar su relación concubinaria), sino del resto del personal del SEA incluyendo a la apelante. Ésta última tuvo incluso que lidiar con la persona que hacía las amenazas.

Tomamos en cuenta que las amenazas que alegadamente incidieron en el estado mental de la apelante no las hizo la UPR. No obstante, hay que determinar si medió culpa o negligencia de su parte por la forma en que atendió o dejó de atender la situación antes aludida aun cuando incidió en el funcionamiento del centro de trabajo de la apelante. De mediar culpa, habrá de determinarse si se le debe responsabilizar por la total producción de los daños o si, en cambio, debería sólo imponérsele un por ciento de responsabilidad.

Claro está, ese análisis debe estar precedido de una determinación relacionada a si existe o no nexo causal entre los actos u omisiones culposas que pudieran imputársele a la UPR. Para ello, estimamos necesario que se examine la prueba pericial que obra en el expediente -esto es, diagnósticos, recomendaciones e informes de peritos médicos que atendieron a la apelante. Entendemos que una determinación a los efectos de si la situación de las constantes amenazas, o de no permitir el traslado de la secretaria o de la apelante, o de autorizar el traslado, pero alegadamente bajo condiciones de trabajo inadecuadas, eran capaces o no de producir la condición mental que se aduce sufre la apelante, amerita el escrutinio de prueba pericial.

Por otro lado, descartamos la aplicación de la figura de la prescripción en este caso. El asunto deberá ser discutido por las partes con mayor detenimiento en el proceso plenario. Para ello, habrá de tomarse en cuenta que en junio de 1999 fue que un médico que atendió a la apelante sugirió un nexo entre las condiciones mentales que

desarrolló aquélla con el ambiente y circunstancias de su centro de trabajo. En ese momento, podría entenderse que la apelante conoció del daño que alegó en su causa de acción, y más importante aún, del agente que causó o que contribuyó a la producción del daño. Por otro lado, la apelante presentó originalmente su causa de acción en mayo de 2000, y en junio de 2000, lo que hizo fue enmendar la causa de acción previa presentación de alegación responsiva de la UPR.

## IV

En mérito de lo anterior, revocamos el dictamen apelado. Devolvemos el caso para la celebración de juicio. Previo al señalamiento de vista, habrá de analizarse si en efecto el proceso descubrimiento de prueba culminó adecuadamente. De no ser así, se proveerá para el descubrimiento cabal de la prueba.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

. Lcda. María E. Pérez Ortiz
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2008 DTA 81

**1.** Advertimos que según los hechos que estimó probados el TPI, más bien, la que disfrutó de licencia sin sueldo para esa fecha, fue la secretaria del SEA y no la apelante.

**2.** Destacamos que en el expediente del caso aparece, originalmente, que la causa de acción se presentó en mayo de 2000 (aparentemente el 24 de mayo de 2000). Luego, en junio de 2000, se enmendó la causa de acción (el **20** o **28** de junio de 2000 – no se distingue bien de la copia que obra en el expediente).